# In the Iowa Supreme Court

No. 23–1154

Submitted February 18, 2025—Filed April 25, 2025

**Estate of Phillip Raymond Morgan,** by administrator and personal representative, **Kera Morgan,**

Appellant,

vs.

**Union Pacific Railroad Company,** a Delaware corporation,

Appellee.

Appeal from the Iowa District Court for Polk County, Scott D. Rosenberg, judge.

The administrator of the estate of a railroad worker who committed suicide following workplace harassment by a supervisor appeals a district court's summary judgment ruling dismissing her claims under the Federal Employers' Liability Act. **Affirmed.**

Mansfield, J., delivered the opinion of the court, in which Waterman, McDermott, and May, JJ., joined. Oxley, J., filed a dissenting opinion, in which McDonald, J., joined. Christensen, C.J., took no part in the consideration or decision of the case.

Paul Slocomb (argued) of Blunt Slocomb, Ltd., St. Louis, Missouri, and George F. Davison, Jr. of Law Office of George F. Davison, Jr., LC, Des Moines, for appellants.

Jonathan B. Amarilio (argued), J. Timothy Eaton, and Benjamin S. Morrell of Taft Stettinius & Hollister LLP, Chicago, Illinois, and R. Todd Gaffney and Joseph F. Moser of Finley Law, Des Moines, for appellee.

**Mansfield, Justice.**

### I. Introduction.

A railroad worker committed suicide following months of alleged harassment at work by his supervisor. Seeking wrongful death damages, the administrator of his estate has filed suit against the railroad under the Federal Employers' Liability Act (FELA). FELA provides that

> [e]very common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, in case of the death of such employee, to his or her personal representative . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier.

45 U.S.C. § 51. Despite this broad language, the United States Supreme Court has concluded that FELA generally incorporates common law limits as to compensable injuries. *See Consol. Rail v. Gottshall*, 512 U.S. 532, 555 (1994). Accordingly, and consistent with the common law of negligence as it exists in a number of jurisdictions, the Supreme Court has allowed railroad employees to recover for physical and emotional injuries, but only when there is physical impact or "negligent conduct of their employers that threatens them imminently with physical impact." *Id.* at 556.

We conclude that the claim here does not fall within these boundaries. The injuries suffered by the worker because of his supervisor's harassment were emotional injuries not tied to a physical impact or harm or a near impact or harm. FELA does not provide coverage. Therefore, we affirm the district court's grant of summary judgment to the railroad.

**II. Facts and Procedural History.**

**A. Background Facts.**[1] Phillip Morgan began working for the engineering services track department at the Union Pacific Railroad Company in 1998 as a welder. However, he later bid for and took a position as a welder helper because he did not want to have the additional responsibilities that came with being a welder. Both the welder helper and welder jobs required working in "red zones." According to Union Pacific's rules, a red zone is "that area, within an arm's length of the track or any physical position, which places the employee in a life-threatening situation."

Still, during Phillip's twenty years working within red zones, Phillip's wife Kera could recall only time when her husband reported a safety-related incident to her. That was when a train passed on a parallel track as Phillip and his crew were working. No one was injured then, and Kera could not remember when that incident occurred.

A family man and a hard worker, Phillip did not have many outside interests. Rather, he dedicated most of his time to his work at Union Pacific and to being with his family. Phillip also raised calves with Kera on their land in Mapleton. Kera recalls that while work loomed large in Phillip's life, he never brought his work problems home with him. This changed a few months prior to his suicide. Kera recalled that she and her husband began spending their nights discussing the difficulties he was having at work, especially with his supervisor Michael Tomka. In addition to working for Union Pacific, Tomka had a military background and served in the Army National Guard.

---

[1]Because this is an appeal from a grant of summary judgment, we recite the facts in the light most favorable to the plaintiff, Kera Morgan.

According to Kera, Tomka had been bothering Phillip about shifting back to being a full welder. She claims Tomka told Phillip, "We need you to be a soldier. We need you to step up. We need you to become a welder again." She also maintains that Tomka would require Phillip's crew to complete more welds than they were safely able to complete and would harass Phillip about incomplete work. On at least one occasion, Tomka required Phillip's crew to weld from inside a wind tent to avoid inadvertently starting a grass fire while welding. Phillip told his wife this made him feel unsafe because he wasn't able to see if a train might be coming.

Phillip complained to Tomka about his working conditions, with little effect. Instead, Tomka transferred Phillip's crew to work in eastern Iowa. This transfer occurred on April 30, 2018, and the change of locations lasted until mid-July. Tomka's stated reason for the transfer was that there was not enough work in the western area for Phillip's crew. However, at the same time Phillip's crew moved east, another crew moved west to do the same work.

This crew swap placed Phillip far from home, requiring him to make a three-and-a-half-hour commute each way. According to Kera, around the time this swap occurred, Phillip began having trouble sleeping. He was only getting two to four hours of sleep each night. One of Phillip's coworkers, Chris Gatton, recalled that Tomka harassed their crew at work and focused his ire on Phillip in particular. Several times Tomka took Phillip aside to talk to him, and each time Phillip would return noticeably shaken. On one occasion when Gatton asked Phillip what was wrong, Phillip answered that Tomka had threatened to fire him.

Tomka's supervision made life difficult for Phillip in other ways as well. Phillip's requests for compensation for the additional miles he had to drive to the

eastern Iowa work location were routinely denied. Kera stated that at one point the company was two months behind on compensating him for mileage.

Benton Warnke, Phillip's union representative, recalled that following the crew swap, Phillip began acting "really beat down." Phillip confided in Warnke that Tomka was "messing with him." On May 8, Warnke confronted Tomka, who responded that Phillip "needs to bid the welder position." When Warnke told Tomka that he needed to stop pressuring Phillip so much, Tomka responded that Phillip "is a soldier and he needs to start stepping up to the plate and doing what they want him to do, and then" things will get a "little more conven[ient] for him." Warnke also confronted Jason Cheney, Tomka's supervisor, about why Tomka had decided to swap the eastern and western crews, stating that the arrangement "[w]asn't making a lot of sense." In mid-July, the decision was made to reverse the swap and return the eastern Iowa and western Iowa crews back to their original locations.

Even though Phillip resumed working closer to home, his mental state did not improve. On July 24, Phillip left for work but did not arrive because he decided to return home. He told Kera that "he could not go there. He could not be there." Kera was concerned; to her, Phillip looked "more frazzled than [she] had ever seen him before." She set up an appointment and brought him to see a doctor that same day. Dr. Lynn Charrlin diagnosed Phillip with anxiety and insomnia and prescribed him medication to relieve the symptoms from those conditions. Dr. Charrlin also discussed the possibility of Phillip seeing a counselor or psychiatrist for his problems, but Phillip declined. Around the same time, union representative Warnke once again spoke with Tomka's supervisor Cheney about Phillip. Warnke told Cheney, "Phil's got some -- there's something going on. We need to kinda get this guy some help because he's not himself."

On the evening of August 18, Kera thought that Phillip was acting normally. He took his medications and went to bed. But at some point that night, Phillip woke up, went to a hill overlooking his land, and ended his own life with a firearm.

A psychiatric expert retained by Kera provided an opinion to a reasonable degree of medical certainty that "Philip Morgan's suicide was a direct result of the stress and harassment he underwent for months at work culminating with his self-inflicted gunshot wound on August 18, 2018."

**B. District Court Proceedings.** Kera, as the personal representative and administrator of Phillip's estate, filed a petition in the Polk County District Court against Union Pacific on July 22, 2021. She brought suit under FELA, which covers claims by railroad employees against railroad companies for injuries "resulting in whole or in part from the negligence" of the company's officers, agents, or employees. 45 U.S.C. § 51. Union Pacific moved for summary judgment, arguing that FELA did not cover Phillip's suicide due to workplace harassment. The district court agreed and granted summary judgment. It concluded that Phillip "clearly suffered an emotional injury caused at least in some part by the stress of his job and supervisor. This emotional injury led to anxiety, insomnia, and eventually Phillip's tragic death." However, the district court held that because these injuries were the result of neither a physical impact nor a narrowly escaped physical peril, they fell outside the scope of FELA.

Kera appealed that decision, and we retained the appeal.

**III. Standard of Review.**

"We review summary judgment rulings for correction of errors at law." *Myers v. City of Cedar Falls*, 8 N.W.3d 171, 176 (Iowa 2024) (quoting *Feeback v. Swift Pork Co.*, 988 N.W.2d 340, 346 (Iowa 2023)). "Summary judgment is proper

when the movant establishes there is no genuine issue of material fact and it is entitled to judgment as a matter of law." *Id.* (quoting *Feeback* 988 N.W.2d at 346). "We view the evidence in the light most favorable to the nonmoving party, who is entitled to every legitimate inference that we may draw from the record." *Id.* (quoting *Nelson v. Lindaman*, 867 N.W.2d 1, 6–7 (Iowa 2015)).

**IV. Analysis.**

**A. FELA.** Kera brings this suit under FELA, which provides in relevant part:

> Every common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier . . . , or, in case of the death of such employee, to his or her personal representative, for the benefit of the surviving widow or husband and children of such employee . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier . . . .

45 U.S.C. § 51. "State courts have concurrent jurisdiction over FELA claims." *Giza v. BNSF Ry.*, 843 N.W.2d 713, 715 n.1 (Iowa 2014).

FELA has been "liberally construed . . . to further Congress' remedial goal." *Gottshall*, 512 U.S. at 543. For example, "[i]f negligence is proved . . . and is shown to have '*played any part, even the slightest, in producing the injury*,' then the carrier is answerable in damages even if 'the extent of the [injury] or the manner in which it occurred' was not '[p]robable' or 'foreseeable.' " *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 703–04 (2011) (second and third alterations in original) (footnote omitted) (citation omitted) (first quoting *Rogers v. Mo. Pac. R.R.*, 352 U.S. 500, 506 (1957); and then quoting *Gallick v. Balt. & Ohio R.R.*, 372 U.S. 108, 120–21, 120 n.8 (1963)). This is consistent with the broad causation language in FELA—"resulting in whole or in part." *Id.* at 703–05 (quoting 45 U.S.C. § 51).

**B. The *Gottshall* Zone of Danger Test Under FELA.** While FELA deviates from the common law in certain respects, it is consistent with the common law in others. *Consolidated Rail v. Gottshall* illustrates this point. 512 U.S. at 543–44.

The lead plaintiff in *Gottshall* was a member of a railroad work crew "assigned to replace a stretch of defective track on an extremely hot and humid day." *Id.* at 535. "The crew was under time pressure, and so the men were discouraged from taking scheduled breaks." *Id.* One worker collapsed, but the supervisor told the crew to stop assisting him and to keep working. *Id.* at 536. A few minutes later, that worker had a heart attack and died. *Id.* The supervisor "ordered the men back to work, within sight of [the deceased worker's] covered body." *Id.*

The entire experience left the plaintiff with deep psychological scars. *Id.* The plaintiff "was admitted to a psychiatric institution, where he was diagnosed as suffering from major depression and post-traumatic stress disorder." *Id.* The plaintiff lost a great deal of weight and suffered from suicidal preoccupations and anxiety. *Id.* at 537. He continued to receive psychological treatment after his discharge. *Id.*

The plaintiff sued the railroad under FELA seeking recovery for his injuries. *Id.* But the federal district court granted summary judgment to the railroad on the ground that "FELA did not provide a remedy for [the plaintiff's] emotional injuries." *Id.* The United States Court of Appeals for the Third Circuit reversed, but the Supreme Court in turn reversed the Third Circuit. *Id.* at 535, 537.

The Supreme Court also considered another lower court case in the same opinion. *Id.* at 539. The second plaintiff worked as a train dispatcher. *Id.* He was

required to take on additional duties and work long hours. *Id.* "[The plaintiff] and his fellow dispatchers frequently complained about safety concerns, the high level of stress in their jobs, and poor working conditions." *Id.* Following a promotion that meant added responsibilities and more erratic hours, the plaintiff "began to experience insomnia, headaches, depression, and weight loss." *Id.* Eventually, after an extended period of being required to work twelve- to fifteen-hour shifts for weeks at a time, the plaintiff suffered a nervous breakdown. *Id.*

The plaintiff sued the railroad under FELA and received a substantial jury award of damages. *Id.* The Third Circuit affirmed. *Id.* And here too, the Supreme Court reversed. *Id.* at 535.

Concerning both cases, the Supreme Court explained that FELA, subject to qualifications in the statute, "is founded on common-law concepts of negligence and injury." *Id.* at 543 (quoting *Urie v. Thompson,* 337 U.S. 163, 182 (1949)).

> Thus, although common-law principles are not necessarily dispositive of questions arising under FELA, unless they are expressly rejected in the text of the statute, they are entitled to great weight in our analysis. Because FELA is silent on the issue of negligent infliction of emotional distress, common-law principles must play a significant role in our decision.

*Id.* at 544 (citation omitted). The Court highlighted that FELA is not "a workers' compensation statute." *Id.* at 543.

The Court noted that state courts, applying the common law, "have placed substantial limitations on the class of plaintiffs that may recover for emotional injuries and on the injuries that may be compensable." *Id.* at 546.[2] In particular,

---

[2] *See Overturff v. Raddatz Funeral Servs., Inc.*, 757 N.W.2d 241, 245 (Iowa 2008) ("Absent some physical injury to the plaintiff, emotional-distress damages are allowed only in a few situations where unique circumstances justify the imposition of such a duty on the defendant.");

some states have applied a "physical impact" test, requiring that the plaintiff seeking damages for emotional injuries for a negligent act "have contemporaneously sustained a physical impact (no matter how slight) or injury due to the defendant's conduct." *Id.* at 547. Other states have required that the plaintiff either sustain a physical impact or be within "the zone of danger of physical impact." *Id.* at 547–48 (quoting Richard N. Peason, *Liability to Bystanders for Negligently Inflicted Emotional Harm—A Comment on the Nature of Arbitrary Rules*, 34 U. Fla. L. Rev. 477, 489 (1982)). And still others allow "bystanders" who witness the physical impact to recover in certain circumstances. *Id.* at 548–49.

Expressing a concern that even genuine claims for emotional distress could expose railroads to "unpredictable and nearly infinite liability," the Court held that the "zone of danger" test delineated the proper scope of the railroad's duty. *Id.* at 552–54. The Court concluded that "the policy considerations of the common law as they are embodied in the zone of danger test best accord with the concerns that have motivated our FELA jurisprudence." *Id.* at 557. The Court specifically rejected the notion that FELA provides a remedy "for negligent infliction of emotional distress arising from work-related stress." *Id.* at 554 (quoting *Carlisle v. Consol. Rail*, 990 F.2d 90, 96 (3d Cir. 1993)).

Having adopted the zone of danger test for when a FELA plaintiff may recover for emotional injuries, the court instructed the Third Circuit to enter judgment in favor of the railroad on the second plaintiff's "work-stress-related

---

*Clark v. Est. of Rice*, 653 N.W.2d 166, 170 (Iowa 2002) ("[L]ike most other jurisdictions, we have refused to recognize an independent claim for emotional distress based on negligence without some physical harm."). Iowa has recognized a limited bystander exception. *Clark*, 653 N.W.2d at 170. It is available where the bystander was near the scene of the accident, was a close relative of the victim, and suffered serious emotional distress from witnessing the accident under a reasonable belief that the victim would be seriously injured or killed. *Id.*

claim." *Id.* at 558. It remanded for further proceedings on whether the first plaintiff's claim—involving the plaintiff's trauma from witnessing a nearby death on a hot day—satisfied the zone of danger test. *Id.*

On remand, the railroad was successful in obtaining summary judgment as to the first plaintiff's case. *Gottshall v. Consol. Rail*, 56 F.3d 530, 535–36 (3d Cir. 1995). While the Third Circuit found it somewhat unclear whether the Supreme Court's zone of danger test required an imminent threat of physical impact or merely an imminent threat of physical harm, either way the plaintiff fell outside the zone of danger. *Id.* at 534–35. No physical *impact* at all occurred that day. *Id.* at 535. And while the coworker who died of a heart attack obviously suffered physical *harm*, the plaintiff personally was never at immediate risk of such harm. *Id.*

A few years after *Gottshall*, the Supreme Court reinforced these principles when it turned down another railroad worker's FELA claim. *See Metro–North Commuter R.R. v. Buckley*, 521 U.S. 424, 426–27 (1997). That worker had been negligently exposed to a carcinogen at work, but was seeking only emotional distress damages and no symptoms of disease had emerged. *Id.* The Court noted that *Gottshall* "recognized that the common law of torts does not permit recovery for negligently inflicted emotional distress *unless* the distress falls within certain specific categories that amount to recovery-permitting exceptions." *Id.* at 429. The Court applied *Gottshall* and common law precedents in rejecting the worker's claim. *Id.* at 430–36.

**C. Applying *Gottshall* to This Case.** On its face, our case does not appear to meet *Gottshall*'s zone of danger test for FELA liability. "Under this test, a worker within the zone of danger of physical impact will be able to recover for emotional injury caused by fear of physical injury to himself . . . ." *Gottshall*, 512

U.S. at 556. Phillip's emotional injuries, however, resulted from an accumulation of stress at work, due in large part to his supervisor's mistreatment. There was no physical impact or harm at the workplace, nor was Phillip within the zone of danger of an actual or potential physical impact or harm.

Kera counters that her case is different from *Gottshall*, because suicide— a self-inflicted death by gunshot—is clearly a physical injury. But to be precise about it, Phillip sustained emotional injuries at work. Those injuries in turn had physical consequences for Phillip, including the most serious consequence of all—the taking of his own life. In that sense, what happened to Phillip is similar in kind, although not in degree, to what happened to the *Gottshall* plaintiffs, who were traumatized at work and thereafter suffered physical harms such as weight loss, depression, and insomnia. *Id.* at 539.

In the present case, as in *Gottshall*, there wasn't a direct physical impact, physical harm, or threat of physical harm that occurred at the workplace. There were emotional and psychological harms that then led to adverse physical effects for the worker. And the Supreme Court has held that the worker cannot recover in that situation unless the worker was in the zone of danger, which Phillip wasn't.

The Eighth Circuit's decision in *Crown v. Union Pacific Railroad* illustrates this point. 162 F.3d 984 (8th Cir. 1998). There the worker claimed that the railroad required employees to work excessive hours, failed to install adequate lighting, and ignored complaints about the poor working conditions. *Id.* at 985. The worker alleged that he suffered severe workplace stress that led to extreme weight gain, carpal tunnel syndrome, knee joint problems, cough syncope syndrome, sleep apnea, diabetes, nicotine and alcohol addictions, and a nervous breakdown requiring hospitalization. *Id.* Undoubtedly, these were serious

physical problems. Yet the Eighth Circuit affirmed summary judgment, holding that

> [d]espite his evidence of emotional and physical injuries, Crown has not shown that the railroad's negligence caused him to suffer a physical impact or a risk of immediate physical harm as required by *Gottshall* . . . . Therefore, Crown has failed to show that he was within the zone of danger, which is an element essential to his recovery.

*Id.* at 986.

*Fulk v. Norfolk Southern Railway* provides a close factual parallel to the present case. 35 F. Supp. 3d 749 (M.D.N.C. 2014). The worker in *Fulk* was a safety inspector responsible for tagging defective or unsafe rail cars so they could be taken out of use until repairs were complete. *Id.* at 752. The railroad pressured the inspector not to tag cars and routinely removed the tags before repairs were made. *Id.* Refusing to bow to this pressure, the inspector was then subjected to "abusive intimidation, disciplinary threats, and job threats" and received false disciplinary complaints that were "an attempt to terminate [him] because he would not help violate [federal] regulations." *Id.* at 752–53. Seven days after the company made the false complaints, the inspector signed in to work, walked out to the employee parking lot, and shot himself in the head. *Id.* at 753.

Like Kera here, the plaintiffs in *Fulk* argued that a self-inflicted fatal gunshot wound was a physical injury for FELA purposes. *Id.* at 756–57. The federal district court disagreed, reasoning that the immediate injuries from the company's harassment and intimidation were emotional injuries which then had a physical manifestation when the worker committed suicide. *Id.* The court explained that "even severe mental or emotional injuries that lead to physical manifestations are insufficient, on their own, to bring a claim within FELA." *Id.*

at 756. The *Fulk* court therefore granted the railroad's motion to dismiss as to the FELA claim. *Id.* at 764–65.

In sum, we are not persuaded by Kera's effort to distinguish *Gottshall* on the ground that her case involves a physical as opposed to an emotional injury.

**D. Arguments Based on the Literal Language of FELA.** Kera argues that FELA should be taken 100% literally. If someone suffers "injury" or "death" due to the employer's "negligence," including the negligent infliction of emotional distress, they should recover. 45 U.S.C. § 51. Truth be told, there *is* a Supreme Court opinion that supports that view. However, it is the *dissenting* opinion in *Gottshall.* In dissent, Justice Ginsburg wrote,

> In my view, the Court of Appeals correctly determined that Gottshall's submissions should survive Conrail's motion for summary judgment, and that the jury's verdict in favor of Carlisle should stand. Both workers suffered severe injury on the job, and plausibly tied their afflictions to Conrail's negligence. Both experienced not just emotional, but also physical, distress: Gottshall lost 40 pounds and suffered from insomnia, physical weakness, and cold sweats, while Carlisle experienced "insomnia, fatigue, headaches, . . . sleepwalking and substantial weight-loss."

*Gottshall,* 512 U.S. at 568 (Ginsburg, J., dissenting) (omission in original) (quoting *Carlisle,* 990 F.2d at 92).

The *Gottshall* majority, by contrast, reasoned that "the common-law background of this right of recovery must play a vital role in giving content to the scope of an employer's duty under FELA to avoid inflicting emotional injury." *Id.* at 551 (majority opinion). In the majority's view, FELA incorporates the common law zone of danger test, under which negligently inflicted emotional distress resulting in physical harm is compensable only if the plaintiff first suffered a physical impact or was in immediate risk of such an impact. *Id.* at 547–48. We are constrained to follow the Supreme Court majority opinion in *Gottshall.*

*Gottshall* is not an outlier in Supreme Court jurisprudence. As the Court has put it, "Statutory causes of action are regularly interpreted to incorporate standard common-law limitations on civil liability . . . ." *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. 118, 130 n.5 (2014).

Kera also argues that FELA treats emotional distress resulting in death differently from nonfatal emotional distress. We see no basis for such a distinction. FELA addressed injury and death separately because the wrongful-death action did not exist at common law. *See St. Louis, Iron Mountain, & S. Ry. v. Craft*, 237 U.S. 648, 655 (1915) ("By the common law the death of a human being, although wrongfully caused, affords no basis for a recovery of damages, and a right of action for personal injuries dies with the person injured."). Therefore, if the employee died in a workplace accident, it was necessary to specify who could bring a FELA claim and for whose benefit. *See id.* at 657 (stating that 45 U.S.C. § 51 "provide[s] for two distinct rights of action: one in the injured person for his personal loss and suffering where the injuries are not immediately fatal, and the other in his personal representative for the pecuniary loss sustained by designated relatives where the injuries immediately or ultimately result in death").

It then became apparent that FELA had a gap: what about damages for the "personal loss and suffering" of the fatally injured employee prior to their death? *Id.* at 656–57. The common law extinguished that cause of action as well. *Id.* So, two years after 45 U.S.C. § 51 was enacted, 45 U.S.C. § 59 was added. *See St. Louis, Iron Mountain, & S. Ry.*, 237 U.S. at 657–58. It provides, "Any right of action given by this chapter to a person suffering injury shall survive to his or her personal representative . . . ." 45 U.S.C. § 59. This enables the personal representative

> to recover on behalf of the designated beneficiaries, not only such damages as will compensate them for their own pecuniary loss, but also such damages as will be reasonably compensatory for the loss and suffering of the injured person while he lived. Although originating in the same wrongful act or neglect, the two claims are quite distinct, no part of either being embraced in the other.

*St. Louis, Iron Mountain, & S. Ry.*, 237 U.S. at 658.

Thus, Congress wrote FELA as it did to overcome common law limits on legal *standing* when the injured party died, not to exempt parties from common law limits on recovery for emotional distress. Certainly there is no language in *Gottshall* to support a different view, and we are obligated to follow *Gottshall*.

As the Supreme Court put it in *Gottshall*, "The zone of danger test also is consistent with FELA's central focus on physical perils. We have recognized that FELA was intended to provide compensation for the injuries and deaths caused by the physical dangers of railroad work by allowing employees or their estates to assert damages claims." 512 U.S. at 555; *see also id.* at 555–56 ("FELA was (and is) aimed at ensuring 'the security of the person from physical invasions or menaces.'" (quoting *Lancaster v. Norfolk & W. Ry.*, 773 F.2d 807, 813 (7th Cir. 1985))).

**E. Restatement (Second) of Torts Section 455.** Alternatively, Kera argues that suicide is sui generis and therefore not covered by the *Gottshall* ruling. Kera relies on the Restatement (Second) of Torts section 455, which states,

> If the actor's negligent conduct so brings about the delirium or insanity of another as to make the actor liable for it, the actor is also liable for harm done by the other to himself while delirious or insane, if his delirium or insanity
>
> (a) prevents him from realizing the nature of his act and the certainty or risk of harm involved therein, or

> (b) makes it impossible for him to resist an impulse caused by his insanity which deprives him of his capacity to govern his conduct in accordance with reason.

Restatement (Second) of Torts § 455, at 493 (Am. L. Inst. 1965). She also directs our attention to the following illustration in section 455:

> A negligently injures B. The injuries cause insanity which takes the form of suicidal mania. While suffering in this condition, B locks his door to prevent interference and cuts his throat with a knife which he has secreted and sharpened for that purpose. A's negligence is the legal cause of B's death or other harm resulting from his cutting his throat.

*Id.* cmt. *c.*, illus. 3, at 494.

We question whether section 455 even creates a suicide exception to the general rule that negligent conduct causing emotional injury is not compensable unless there was physical impact, physical harm, or the threat of physical impact or physical harm. Note that illustration 3 first requires a negligent injury, which in context we believe refers to a negligent physical injury. The illustration states that it is based on *In re Sponatski*, 108 N.E. 466 (Mass. 1915), a case where the decedent received a splash of molten lead into his eye and then ultimately became insane and took his own life. *Id.* at 466. Section 455 is part of a chapter of the Restatement (Second) on legal cause, not duty, and is not replicated in the Restatement (Third).

Kera cites three federal district court cases that recognized the possibility of recovering under FELA for a suicide that could be traced to workplace stress and mistreatment. *See Delise v. Metro–N. R.R.,* 646 F. Supp. 2d 288, 291 (D. Conn. 2009) (denying summary judgment on a FELA suicide claim because there was a fact issue whether the railroad's negligent supervision played a part in the decedent's death and whether the suicide was the result of an "uncontrollable impulse"); *Halko v. N.J. Transit Rail Operations, Inc.,* 677 F.

Supp. 135, 142 (S.D.N.Y. 1987) ("[S]uicide is actionable under the FELA when the suicide is committed in a state of insanity."); *Nelson v. Seaboard Coast Line R.R.*, 398 So. 2d 980, 982 (Fla. Dist. Ct. App. 1981) (explaining that a FELA suicide claim is permissible if the railroad's negligence drove the employee "beyond the point where he could rationally decide against killing himself").

Of these cases, only *Delise v. Metro–North Railroad* was decided after *Gottshall. Delise*'s discussion of the FELA claim is brief and does not mention *Gottshall. See Delise*, 646 F. Supp. 2d at 291. That diminishes the value of *Delise* for our purposes. The federal district court in *Fulk* had the same critique: "[T]he [*Delise*] opinion offers very little in the way of specific facts and, in the absence of any discussion about *Gottshall,* the opinion is not persuasive as to this case." *Fulk*, 35 F. Supp. 3d at 758.

Even if we assume that Restatement (Second) section 455 would not require a prior physical injury, the section "is in some tension with *Gottshall,* which requires plaintiffs to satisfy the zone of danger test for negligent infliction of emotional distress claims." *Id.* at 755 n.4. Hence, the *Fulk* court determined that it did not need to consider section 455 because the *Gottshall* zone of danger test controlled. *Id.* at 755. We are bound by *Gottshall.*

**F. The "Red Zone" vs. the Zone of Danger.** Finally, Kera argues that the zone of danger test is met because Phillip, in fact, regularly worked in "red zones." But the "zone of danger" for FELA purposes and Union Pacific's "red zones" are two different things. Under the zone of danger test, the worker must be within the area at risk of physical impact or physical harm when the impact or near-impact occurs. *Gottshall*, 512 U.S. at 556 ("Railroad employees . . . will be able to recover for injuries—physical and emotional—caused by the negligent conduct of their employers that threatens them imminently with physical

impact."). There is no evidence that this paradigm describes Phillip's case. Phillip suffered emotional trauma from harassment and stress, not from witnessing a specific accident or a close call. In fact, Kera could recall Phillip telling her about only one close call in his twenty-year career. This was when he and his crew were working on one set of tracks and a train came down the adjacent set of tracks. No one was hurt, and Kera had no recollection of when it occurred. There is no showing that it bore an actual relationship to Phillip's suicide, which Kera attributes to Tomka's ongoing harassment and the general stress of the job.

The term "red zone," by contrast, is simply Union Pacific's name for an area where heightened safety precautions are necessary due to an elevated degree of risk. Union Pacific welders and assistant welders regularly work in red zones. "Red zone" does not refer to an actual *incident* of physical harm or impact or near physical harm or impact. Thus, the fact that Phillip regularly worked in "red zones" does not mean he was in the zone of danger for *Gottshall* purposes.

We take guidance from the Tenth Circuit's decision in *Smith v. Union Pacific Railroad*, 236 F.3d 1168 (10th Cir. 2000). There the Tenth Circuit applied *Gottshall* in rejecting a railroad worker's claim for emotional injuries that included anxiety attacks, depression, and insomnia based on job stress. *Id.* at 1169–70. The court reasoned, "Under the zone of danger test, Mr. Smith's claim for his emotional injuries can survive only if he can show he was within the zone of danger of some physical impact." *Id.* at 1172. The court added,

> Mr. Smith does not contend that any object or any employee at Union Pacific had a physical impact on him. Nor does he assert that he feared physical impact with an object because his erratic work schedule caused him to be drowsy during work hours. Indeed, Mr. Smith does not describe any accident at all.

*Id.* at 1173; *see also Murphy v. Metro. Transp. Auth.*, 548 F. Supp. 2d 29, 46 (S.D.N.Y. 2008) (finding that an employer's order to an employee to return to

work in a dangerous environment was insufficient for liability under the zone of danger test); *Tongret v. Norfolk & W. Ry.*, 980 F. Supp. 903, 907–08 (N.D. Ohio 1997) (holding that workplace threats and harassment, including a supervisor putting the employee in a headlock, did not mean that the employee was in the zone of danger for FELA purposes).

In sum, we believe *Gottshall* controls here and requires us to affirm the district court's grant of summary judgment.

**V. Conclusion.**

For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of Union Pacific.

**Affirmed.**

Waterman, McDermott, and May, JJ., join this opinion. Oxley, J., files a dissenting opinion, in which McDonald, J., joins. Christensen, C.J., takes no part.

#23–1154, *Morgan v. Union Pacific Railroad Co.*

**Oxley, Justice (dissenting).**

Kera Morgan brought a Federal Employers' Liability Act (FELA) claim for wrongful death premised on her husband Phillip's suicide, allegedly caused by his employer's negligence. In granting summary judgment, the district court first characterized the claim as one for negligent infliction of emotional distress subject to the "zone of danger test." It then concluded that Phillip's suicide was not compensable because only "emotional damages that stem from actual physical injuries suffered by an employee" are covered under the FELA. The majority adopted this position to affirm summary judgment.

But Kera isn't suing to recover for Phillip's emotional or mental injuries. She is suing for his death. I respectfully dissent.

### I. Background of FELA Liability.

> Before FELA was enacted [in 1908], the "harsh and technical" rules of state common law had "made recovery difficult or even impossible" for injured railroad workers. *Trainmen v. Virginia ex rel. Virginia State Bar,* 377 U.S. 1, 3, 84 S. Ct. 1113, 12 L. Ed. 2d 89 (1964). "[D]issatisfied with the [railroad's] common-law duty," Congress sought to "supplan[t] that duty with [FELA's] far more drastic duty of paying damages for injury or death at work due in whole or in part to the employer's negligence." *Rogers* [*v. Mo. Pac. R.R.*], 352 U.S. [500, 507 (1957)].

*CSX Transp., Inc. v. McBride*, 564 U.S. 685, 695 (2011) (second, third, fourth, and fifth alterations in original). So, Congress passed FELA, under which:

> Every common carrier by railroad while engaging in commerce . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, in case of the death of such employee, to his or her personal representative . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier . . . .

45 U.S.C. § 51.

This case requires us to determine the proper framework for considering whether Phillip's suicide could be covered by FELA. The United States Supreme Court has repeatedly rejected attempts to limit the types of injuries to which FELA liability can attach. In *Urie v. Thompson,* the Court rejected the Missouri Supreme Court's holding that a railroad was not liable to its employee who contracted silicosis from breathing "silica dust blown or sucked into the cabs of the locomotives on which he had worked" as a fireman for over thirty years. 337 U.S. 163, 166, 168, 196 (1949). Addressing the "novel" question of "whether silicosis is an 'injury' " under FELA, the Court held that "silicosis is within the statute's coverage when it results from the employer's negligence." *Id.* at 180.

In reaching that conclusion, the Court recognized "that, when the statute was enacted, Congress' attention was focused primarily upon injuries and death resulting from accidents on interstate railroads." *Id.* at 181. But even if accidental injuries "were the major causes of injury and death resulting from railroad operations, . . . [they] were not the only ones likely to occur." *Id.* Looking to the language of FELA, the Court concluded that industrial diseases were also covered, explaining:

> The language is as broad as could be framed . . . . On its face, every injury suffered by any employee while employed by reason of the carrier's negligence was made compensable. The wording was not restrictive as to the employees covered; the cause of injury, except that it must constitute negligence attributable to the carrier; or the particular kind of injury resulting.

*Id.*

Forty-five years later, the question of whether FELA covers mental injuries arose in *Consolidated Rail v. Gottshall,* 512 U.S. 532, 542 (1994) ("Our task today is determining under what circumstances emotional distress may constitute 'injury' resulting from 'negligence' for purposes of the statute."); *see also id.* at

544 ("[A] definitional point should be clarified at the outset. The injury we contemplate when considering negligent infliction of emotional distress is mental or emotional injury . . . ." (citation omitted)). The Court concluded the answer was "an easy one"—yes, FELA covers mental injuries as well as physical ones. *Id.* at 550. In reaching that conclusion, the Court again first "look[ed] to FELA itself" and then "consider[ed] the common law's treatment of the right of recovery asserted by respondents." *Id.* at 541–42.

The right to recover emotional distress damages "was recognized in some form by many American jurisdictions at the time FELA was enacted" and was "nearly universally recognized among the States" when *Gottshall* was decided. *Id.* at 550. Given this then-current state of the common law, the Court saw "no reason why emotional injury should not be held to be encompassed within th[e] term ['injury'], especially given that 'severe emotional injuries can be just as debilitating as physical injuries.' " *Id.* (quoting *Gottshall v. Consol. Rail*, 988 F.2d 355, 361 (3d Cir. 1993)).

That said, "[n]o jurisdiction . . . allow[ed] recovery for all emotional harms, no matter how intangible or trivial, that might be causally linked to the negligence of another." *Id.* at 545 (recognizing that "a variety of policy considerations" supported the limitations). So, the common law placed "significant limitations, taking the form of 'tests' or 'rules' " on the right to recover emotional distress damages. *Id.* The limitations helped avoid "the very real possibility of nearly infinite and unpredictable liability for defendants" by limiting the class of plaintiffs who could recover for emotional injuries and the injuries that were compensable. *Id.* at 546.

It was within this context that the Court considered the three theories of liability then recognized for a claim for negligent infliction of emotional distress:

the "physical impact" test, the "zone of danger" test, and the "relative bystander" test. *Id.* at 546–48. The relative bystander test had been extended beyond the direct bystander, and the Court was concerned that "any Conrail employees who heard or read about the events surrounding [their coworker's] death could also foreseeably have suffered emotional injury as a result." *Id.* at 553. So, the Court concluded that the zone of danger test was a better fit for applying FELA liability while avoiding "unlimited and unpredictable liability." *Id.* at 557; *see also Norfolk & W. Ry. v. Ayers*, 538 U.S. 135, 146 (2003) (describing the Court's concern in *Gottshall*: "that uncabined recognition of claims for negligently inflicted emotional distress would 'hol[d] out the very real possibility of nearly infinite and unpredictable liability for defendants' " (alteration in original) (quoting *Gottshall*, 512 U.S. at 546)).

*Gottshall*'s approach—looking to the common law to help define the extent of a railroad's liability for its negligent acts—followed from what the Court had earlier said in *Kernan v. American Dredging Co.*, 355 U.S. 426 (1958). "[I]nstead of a detailed statute codifying common-law principles, Congress saw fit to enact a statute of the most general terms, thus leaving in large measure to the courts the duty of fashioning remedies for injured employees in a manner analogous to the development of tort remedies at common law." *Id.* at 432. In writing the statute as it did, Congress expressed a clear intent "to provide liberal recovery for injured workers." *Id.* Further, Congress did not create a "static remedy, but one which would be developed and enlarged to meet changing conditions and changing concepts of [the] industry's duty toward its workers." *Id.*; *see also Atchison, Topeka & Santa Fe Ry. v. Buell*, 480 U.S. 557, 570 (1987) ("In short, the question whether one can recover for emotional injury may not be susceptible to an all-inclusive 'yes' or 'no' answer. As in other areas of law, broad

pronouncements in this area may have to bow to the precise application of developing legal principles to the particular facts at hand.").

These Supreme Court precedents reveal the following relevant points: (1) FELA liability is intended to broadly apply to injuries or death caused by a railroad's negligence; (2) courts have a "duty of fashioning remedies for injured employees in a manner analogous to the development of tort remedies at common law," *Kernan*, 355 U.S. at 432; (3) FELA remedies are not trapped in amber, but should "be developed and enlarged to meet changing conditions and changing concepts of [the] industry's duty toward its workers," *id.*; and (4) the Court has repeatedly rejected attempts to limit the types of injuries compensable under FELA.

**II. Death by Suicide Is Not Governed by the *Gottshall* Zone of Danger Test.**

The majority starts with the foregone conclusion that Kera's claim must fit within *Gottshall*'s zone of danger test to be compensable under FELA. But *Gottshall* did not involve a suicide. Rather, it involved the very different question of whether an emotional or mental injury was an "injury" for FELA purposes. Having concluded that it is, the Court then set out to determine the scope of the employer's liability for a mental injury, settling on the zone of danger test among the three tests then recognized at common law to identify when damages for emotional distress injuries are recoverable.

The majority reasons that suicide is merely a physical manifestation, or physical consequence, of what is really an emotional injury. In the majority's view, taking one's life is just the most serious of such consequences, and Phillip's suicide merely followed from the emotional injuries he suffered at work. So, the reasoning goes, his death is really only an emotional injury. The majority analogizes Phillip's death to the physical manifestations identified in *Gottshall*,

such as nausea, weight loss, and insomnia, 512 U.S. at 536–37, or the weight gain, carpal tunnel syndrome, knee joint problems, cough syncope syndrome, sleep apnea, and diabetes identified in *Crown v. Union Pacific Railroad*, 162 F.3d 984, 985 (8th Cir. 1998), as the symptoms an employee manifested from stressful working conditions. The majority finds significance in the fact that *Gottshall* and *Crown* both involved "serious physical problems," yet the courts in those cases still applied the zone of danger test to preclude recovery.

But that reasoning ignores the fact that the employees in *Gottshall* and *Crown* sought to recover damages for emotional distress, not for the related physical injury. The "physical problems" were relevant in those cases only because a manifestation of physical symptoms is generally a prerequisite for awarding emotional distress damages under a negligent infliction of emotional distress claim. *See Gottshall*, 512 U.S. at 544 ("The injury we deal with here is mental or emotional harm (such as fright or anxiety) that is caused by the negligence of another and that is not directly brought about by a physical injury, but that may manifest itself in physical symptoms."); *see also Sawyer Bros. v. Island Transporter, LLC*, 887 F.3d 23, 39–40 (1st Cir. 2018) ("Whether the physical consequences requirement applies to NIED claims under the general maritime law is a matter of some disagreement among the federal courts." (citing *Tassinari v. Key West Water Tours, L.C.*, 480 F. Supp. 2d 1318, 1321–22 (S.D. Fla. 2007), as collecting cases)).

But once liability under a claim for negligent infliction of emotional distress is established, the damages award is based on compensation for the emotional injuries, not the physical manifestations. *See Sawyer Bros.*, 887 F.3d at 41 (affirming $50,000 awards for emotional distress under general maritime law to each of two individuals who were inside construction vehicles on a ferry when

high waves caused their vehicles to tip over on the ferry where each suffered minor physical symptoms to support the emotional distress claim but neither suffered significant physical injuries that would justify a $50,000 award). In other words, a claim for negligent infliction of emotional distress is a claim that seeks to recover for the mental injuries; the physical manifestations merely serve to corroborate the existence of the emotional distress injuries and avoid the concern identified in *Gottshall* of "the very real possibility of nearly infinite and unpredictable liability for defendants." 512 U.S. at 546.

None of these cases address the separate and distinct issue of whether death by suicide is covered by FELA. This discussion highlights the importance of analyzing the plaintiff's claim for damages. *See id.* at 541–42 (considering "the common law's treatment of the *right of recovery asserted by respondents*" (emphasis added)). Critically here, Kera does not seek damages for the emotional distress Phillip suffered, as she points out from the fact that she did not bring a survivor's claim under 45 U.S.C. § 59 ("Any right of action given by this chapter to a person suffering injury shall survive to his or her personal representative . . . ."). She is seeking damages for Phillip's death. Whether Phillip was within the zone of danger under the *Gottshall* test is simply irrelevant to this very different claim.

Nor does the majority's concern that FELA is not a workers' compensation insurance statute bring it within *Gottshall*'s framework. When the Court said FELA's liberal construction did not make it "a workers' compensation statute," *Gottshall*, 512 U.S. at 543, the Court was distinguishing between strict liability, which applies to insurers under such statutes, and liability for negligence, which is what triggers FELA liability, *see id.* ("We have insisted that FELA 'does not make the employer the insurer of the safety of his employees while they are on

duty. The basis of his liability is his negligence, not the fact that injuries occur.' " (quoting *Ellis v. Union Pac. R. Co.*, 329 U.S. 649, 653 (1947))). Recognizing that FELA can provide coverage for an employee's suicide does not make it a workers' compensation statute—so long as the negligence element is maintained. In other words, FELA's requirement that recovery is allowed only when the employer's negligence causes the employee's injury or death is what keeps it from becoming a workers' compensation statute. Limiting its remedies to exclude suicides does not.

The Court's most recent case addressing the extent of FELA liability reinforces that its statutory language provides broad coverage, contrary to the majority's extension of *Gottshall* beyond its reach. "The charge proper in FELA cases . . . simply tracks the language Congress employed, informing juries that a defendant railroad caused or contributed to a plaintiff employee's injury if the railroad's negligence played any part in bringing about the injury." *McBride*, 564 U.S. at 688. The Court found support for its broad reading directly from *Gottshall*: "Given the breadth of the phrase 'resulting in whole or in part from the [railroad's] negligence,' and Congress' 'humanitarian' and 'remedial goal[s],' we have recognized that, in comparison to tort litigation at common law, 'a relaxed standard of causation applies under FELA.' " *Id.* at 691–92 (alteration in original) (quoting *Gottshall*, 512 U.S. at 542–43).

Our focus should be on liability for a suicide, not liability for emotional distress. *See, e.g.*, *Burdett v. Harrah's Kan. Casino Corp.*, 311 F. Supp. 2d 1166, 1178–79 (D. Kan. 2004) (noting that the "purpose of the physical injury rule" as a prerequisite to a negligent infliction of emotional distress claim "is to guard against fraudulent or exaggerated claims" and that the rule "recognizes that emotional distress is a common experience in life and is usually trivial" before

rejecting out of hand the argument that suicide by "asphyxiation which results in death is not a physical injury to the individual who experiences it," aptly observing that "the contrary position would be inarguable"). Death by suicide is simply not a mental injury governed by *Gottshall.*

**III. Applying the Proper Suicide Framework.**

The majority dismisses Kera's argument that *Gottshall* does not govern a claim for death from suicide under FELA by relying on the one district court case that has rejected such a claim, *Fulk v. Norfolk Southern Ry.*, 35 F. Supp. 3d 749 (M.D.N.C. 2014). But *Fulk* started with the same foregone conclusion as the majority—that recognizing liability for a suicide is in "tension with *Gottshall,* which requires plaintiffs to satisfy the zone of danger test for negligent infliction of emotional distress claims." *Id.* at 755 n.4. This reliance is circular. Kera argues *Gottshall* does not apply because it did not involve a suicide—essentially, death is different than an emotional injury. The majority responds by saying no it's not, see *Gottshall.* But that assumes the answer to the question.

Before *Gottshall,* courts had recognized that an employer could be liable for an employee's suicide under FELA. *See Halko v. N.J. Transit Rail Operations*, 677 F. Supp. 135, 141–42 (S.D.N.Y. 1987) (denying summary judgment on a FELA claim for employee's suicide based on evidence showing that the railroad "was aware of the character and propensities of various supervisors" who preyed on the employee and holding that "the question of whether the state of mind led to an uncontrollable impulse is far from clear and therefore is for a jury to determine"); *Nelson v. Seaboard Coast Line R.R.*, 398 So. 2d 980, 982 (Fla. Dist. Ct. App. 1981) (holding that an employer may "be liable for the suicide of the deceased" employee if it was "shown that the negligent act of the employer drove the deceased beyond the point where he could rationally decide against killing

himself" and admitting suicide note as "evidence of that state of mind"); *see also Marazzato v. Burlington N. R.R.*, 817 P.2d 672, 674–75 (Mont. 1991) (recognizing that suicide could give rise to FELA liability but granting summary judgment where "there [wa]s no suggestion of any kind in any of the evidence submitted to the Court that would give rise to a finding of foreseeability with respect to a suicide arising from the use of [a rubber room], by any of the employees, or by this specific employee" (second alteration in original)).

*Fulk* and *Delise v. Metro–North Railroad* are the only post-*Gottshall* cases involving a FELA claim premised on an employee's suicide. *See Fulk*, 35 F. Supp. 3d at 756 ("Having found that the zone of danger test applies to Plaintiffs' FELA claim, this court finds that the Complaint does not satisfy that test."); *Delise*, 646 F. Supp. 2d 288, 291 (D. Conn. 2009) (denying summary judgment on a FELA suicide claim because "genuine issues exist as to whether negligent supervision by [the railroad] played a part in [the employee's] death, and as to whether [the employee's] suicide was the result of an 'uncontrollable impulse' "). The majority rejects *Delise* in favor of *Fulk* because *Fulk* follows *Gottshall* while *Delise* doesn't mention it. But it might be that the *Delise* court didn't mention *Gottshall* for the very reason that *Gottshall* did not involve a suicide—and therefore had no bearing on the case before it.

Finally, the majority summarily rejects Kera's argument that the common law recognizes liability for the suicide of another, including, *inter alia*, under the Restatement (Second) of Torts section 455, which addresses a narrow exception to the suicide rule. The majority concludes that the Restatement (Second)'s exception to the suicide rule relies on a lack of causation rather than duty and notes that the provision is not replicated in the Restatement (Third) of Torts.

But the majority fails to recognize the modern trend away from a strict application of the suicide rule and away from the Restatement (Second) of Torts section 455's narrow exception that allows recovery only when the plaintiff commits suicide while in a state of delirium or insanity. *See* Alex B. Long, *Abolishing the Suicide Rule*, 113 Nw. U. L. Rev. 767, 820 (2019) [hereinafter Long] ("Courts should also abolish the rage or frenzy/delirium or insanity exception to the standard suicide rule. The exception is a relic from a time when suicide was not well understood, when societal attitudes on the subject were quite different, and when suicide remained a crime."). Modern cases apply more general causation standards focusing on foreseeability to claims involving liability for the suicide of another. *See Wickersham v. Ford Motor Co.*, 853 S.E.2d 329, 332 (S.C. 2020) ("South Carolina courts apply traditional proximate cause principles in analyzing whether a particular plaintiff can recover for wrongful death from suicide."); *Cotten v. Wilson*, 576 S.W.3d 626, 639–47 (Tenn. 2019) (reviewing the history of the suicide rule in Tennessee, rejecting the argument that conduct had to fit one of the "common exceptions to the suicide rule," and concluding "that 'the touchstone is foreseeability, not whether a given case fits into a previously carved-out exception' " (quoting *Ramsey v. Cocke County*, No. E2016–02145–COA–R3–CV, 2017 WL 2713213, at *6 (Tenn. Ct. App. Mar. 23, 2017))); *see also* Long, 113 Nw. U. L. Rev. at 767 (discussing the "trend among court decisions away from singling out suicide cases for special treatment and toward an analytical framework that more closely follows traditional tort law principles"); 1 Restatement (Third) of Torts: Liab. for Physical & Emotional Harm § 33 cmt. *e.*, at 564–65, cmt. *e.*, illus. 2, at 565 (Am. L. Inst. 2010) (explaining that an intentional tortfeasor can be liable for another's suicide even if it was an unintended harm). This modern trend away from tightly circumscribed

exceptions to the suicide rule is a better explanation for section 455's disappearance from the Restatement (Third) of Torts.

I believe federal courts would consider Kera's request that we look to modern cases addressing liability for the suicide of another in determining whether her FELA claim survives summary judgment. *See Kernan*, 355 U.S. at 432 (explaining that FELA damages should "be developed and enlarged to meet changing conditions and changing concepts of [the] industry's duty toward its workers"); *see also Delise*, 646 F. Supp. 2d at 291 (noting that "genuine issues exist as to whether negligent supervision by [the employer] played a part in Mr. Delise's" suicide to reject summary judgment on a FELA claim); *Fuller v. Preis*, 322 N.E.2d 263, 266 (N.Y. 1974) ("[R]ecovery for negligence leading to the victim's death by suicide should perhaps, in some circumstances, be had even absent proof of a specific mental disease or even an irresistible impulse provided there is significant causal connection." (citations omitted)). "[T]he more recent trend [and better rule] is to place less emphasis on the mental state and more on the causal connection." *Kivland v. Columbia Orthopaedic Grp., LLP*, 331 S.W.3d 299, 308 (Mo. 2011) (en banc) (alterations in original) (quoting *Halko*, 677 F. Supp. at 142).

Under this modern view, the concern with imposing liability for negligence that leads to another's suicide turns on foreseeability. *See Patton v. Bickford*, 529 S.W.3d 717, 731–34 (Ky. 2016) ("We . . . conclude that when the anxiety or torment of bullying is shown to have been a substantial factor in causing death by suicide, the resulting suicide is not a superseding intervening event which bars a victim's estate from prosecuting a wrongful death claim."); *Kivland*, 331 S.W.3d at 309–10 ("A plaintiff can show that the defendant's negligence was the proximate cause of the decedent's suicide by presenting evidence that the

decedent's suicide was the 'natural and probable consequence' of the injury he suffered at the hands of the defendant. . . . [T]he testimony of Dr. Jarvis, if admissible, meets the proximate cause requirement. The burden, as usual, is still on the plaintiff to prove causation to the jury."); *Spring v Allegany-Limestone Cent. Sch. Dist.*, 200 N.Y.S.3d 594, 597–99 (App. Div. 2023) (denying summary judgment to a principal and teacher who were made aware of bullying against a student who died by suicide); *see also Wickersham v. Ford Motor Co.*, 997 F.3d 526, 533–34 (4th Cir. 2021) ("But '[i]n cases involving wrongful death from suicide, [South Carolina] courts have consistently decided legal cause as a matter of law.' Accordingly, the district court must first decide whether Wickersham's suicide was 'unforeseeable as a matter of law.' If not, 'the jury must consider foreseeability' as well as causation-in-fact." (alterations in original) (citations omitted) (quoting *Wickersham*, 853 S.E.2d at 332–33)).

Construing the record here in the light most favorable to Kera as the nonmoving party, Kera presented evidence of bullying and harassment by Michael Tomka that Tomka's supervisor failed to address. Tomka specifically targeted and harassed Phillip. He pushed Phillip to bid back into the more stressful welder position, and when Phillip refused, Tomka threatened to fire him and "ma[de] comments about going to jail." He retaliated against Phillip by sending his crew to the eastern part of the state, requiring Phillip to commute three hours each way to work. And the railroad was aware of the harassing behavior. When Phillip's union representative, Benton Warnke, first confronted Tomka, telling him to stop pressuring Phillip so much, Tomka responded that Phillip "is a soldier and he needs to start stepping up to the plate and doing what they want him to do, and then" things will get a "little more conven[ient] for him." Warnke then went to Tomka's supervisor, Jason Cheney, telling him that

Tomka's treatment of Phillip was pushing him close to the edge: "We need to kinda get this guy some help because he's not himself."

And Kera presented an expert whose opinion provided sufficient foreseeability to send the issue to a jury:

> Based on my review of the above materials it is my opinion to a reasonable degree of medical certainty that Phillip Morgan's suicide was a direct result of the stress and harassment he underwent for months at work culminating with his self-inflicted gunshot wound on August 18, 2018. I concur with Dr. Charrlin's diagnosis of anxiety and insomnia. Unfortunately, both of these symptoms continued to worsen after his July 24, 2018 visit with Dr. Charrlin. It is well documented in the literature that chronic insomnia as well as anxiety can lead to a psychotic type state and be associated with self-harm behaviors.

> My review of the materials you provided, particularly his coworkers and wife's description of his personality traits strongly suggests that Mr. Morgan was a mission driven, ethical family man with a highly developed sense of responsibility and duty. Unfortunately, these somewhat rigid personality traits did not serve him well when confronted with the persistent harassment, bullying and threats he endured by primarily from Mr. Tomka. The tragic end result of these actions was unfortunately almost predictable.

> . . . . Putting increased pressure on a gentleman who has already been recognized by his supervisors and coworkers to be "not himself" is in effect a disaster waiting to happen.

> In summation, it is my opinion to a reasonable degree of medical certainty that Phillip Morgan's suicide was directly caused by the harassment, bullying and pressure he endured from his supervisor in the weeks and months leading up to his demise.

These facts of bullying and harassment reveal that Tomka did much more than create a stressful working environment by not hiring more people or by demanding long hours in generally dangerous conditions, taking this case outside the "unprecedented holding" discussed in *Gottshall* that would "dramatically expand employers' FELA liability to cover the stresses and strains of everyday employment." 512 U.S. at 554. The summary judgment record

should get Kera's case to a jury. *See Patton,* 529 S.W.3d at 731–34; *Kivland,* 331 S.W.3d at 309–10; *Spring,* 200 N.Y.S.3d at 597–99.

The evidence might not convince a jury that Phillip's death "result[ed] in whole or in part from the negligence of any of the officers, agents, or employees" of Union Pacific. 45 U.S.C. § 51. But the majority's opinion that short-circuits the broad framework for FELA liability put in place by Congress ensures the jury will never get the chance. I respectfully dissent.

McDonald, J., joins this dissent.